(No. 51902.—

SEARS, ROEBUCK & COMPANY, Appellee, v. THE INDUSTRIAL COMMISSION *et al.* (Betty Stas, Appellant).

*Opinion filed Feb. 22, 1980.—Rehearing denied March 28, 1980.*

60

RYAN, J., dissenting.

Scheele, Serkland & Boyle, Ltd., of La Grange (James C. Serkland, of counsel), for appellant.

Rooks, Pitts, Fullagar & Poust, of Chicago (Daniel P. Socha and Frank C. Rowland, of counsel), for appellee.

MR. JUSTICE MORAN delivered the opinion of the court:

An Industrial Commission arbitrator awarded compensation to claimant, the widow of Richard Stas, as a result of Stas' death on February 10, 1974. After hearing addi-

tional testimony, the Commission affirmed the arbitrator's decision, but the circuit court of Cook County reversed. Claimant has appealed directly to this court under Rule 302(a). 73 Ill. 2d R. 302(a).

While this cause was pending before us, respondent filed a motion to dismiss. In support of its motion, respondent maintains that claimant failed to file a timely notice of appeal from the circuit court judgment and that, consequently, this court is without jurisdiction.

Supreme Court Rule 303(a), governing appeals from final judgments of the circuit court in civil cases, states:

> "[T] he notice of appeal must be filed with the clerk of the circuit court within 30 days after the entry of the final judgment appealed from, or, if a timely post-trial motion directed against the judgment is filed, *** within 30 days after the entry of the order disposing of the motion." (73 Ill. 2d R. 303(a).)

Section 68.3(1) of the Civil Practice Act, in turn, governs motions after judgment in nonjury cases and provides:

> "[A] ny party may, within 30 days after the entry of the judgment or within any further time the court may allow within the 30 days or any extensions thereof, file a motion for a rehearing, or a retrial, or modification of the judgment or to vacate the judgment or for other relief." (Ill. Rev. Stat. 1977, ch. 110, par. 68.3(1).)

For purposes of the foregoing provisions, workmen's compensation cases are treated in the same manner as other civil cases. *Brady v. Industrial Com.* (1970), 45 Ill. 2d 469, 472.

The circuit court judgment in favor of respondent was entered on December 14, 1978; a notice of appeal was filed February 13, 1979. Respondent admits that, during the intervening time period, it received notice of a motion for rehearing, but states that it never received a copy of the motion, and that no written motion for rehearing was ever filed with the circuit court clerk. In this regard, respondent correctly points out that a notice of motion, without the accompanying written motion, is

insufficient to toll the running of the time for appeal. Section 50(5) of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 50(5)) requires that a motion to set aside a final order, judgment or decree be filed within 30 days after entry thereof. *Kollath v. Chicago Title & Trust Co.* (1975), 62 Ill. 2d 8, decided under section 50(5), held that a notice of motion alone, filed within the 30-day period, did not satisfy such requirement. There, in ruling that the circuit court lacked jurisdiction to entertain plaintiff's oral motion, presented more than 30 days after dismissal of the case, this court relied on the fact that plaintiff had failed, within the specified time, to seek a vacation of the order of dismissal. 62 Ill. 2d 8, 10.

Claimant concedes that a written motion for rehearing was not filed. In contrast to *Kollath,* however, claimant and respondent appeared before the circuit court on January 12, 1979, within 30 days after entry of judgment, and claimant, at that time, orally moved for a rehearing. The court excused claimant from filing a written motion for rehearing and set arguments on the motion for January 31, 1979. After respondent expressed concern over the effect of the order, the court assured respondent that it was not granting claimant's motion, but merely agreeing to hear arguments on the motion. The court further indicated that the effect of its ruling would be to stay the running of the appeal time until January 31, 1979. Respondent did not object to the claimant's failure to file a written motion. Moreover, in response to the court's reference to the time for appeal, respondent stated, "I'll have no quarrel with the staying at this time." Thereafter, at the January 31, 1979, hearing, the circuit court denied claimant's motion for rehearing. Claimant filed a notice of appeal on February 13, 1979.

While the actions and proceedings surrounding the motion below are not a model of proper civil procedure, respondent's acquiescence served to cure any errors that may have occurred. With the approval of the court and

the assent of respondent, and within 30 days after judgment, as required by section 68.3(1) of the Civil Practice Act, claimant moved orally for a rehearing. One effect of the foregoing was to prevent the December 14 judgment from becoming final until 30 days after the court's order disposing of the motion. Claimant thereafter filed the notice of appeal within the requisite time period. Under the circumstances, respondent's motion to dismiss is denied.

Stas was employed by respondent, Sears, Roebuck & Company, as a shop technician, repairing gear cases. On October 31, 1973, he entered Lutheran General Hospital, where he was placed in the Alcoholic Rehabilitation Center. There, a program was designed for the treatment of Stas' alcoholism. It included sessions with a therapist, and was to involve the participation of his family and his employer. As his treatment progressed, an appointment was made for approximately 1 p.m. on November 16, 1973, when Stas was to meet with his therapist and Herb Grunde, his supervisor at Sears. Shortly before the scheduled conference, however, Stas suffered a myocardial infarction and, at approximately 12:50 p.m., was transferred to the hospital's emergency room. On December 8, 1973, he was released from the hospital and returned home. Stas went back to work on February 4, 1974, but, under doctor's orders, was limited to light work for half days only. Grunde testified that when Stas returned to work on February 4, 1974, he looked greatly improved and moved faster than he had prior to his hospitalization, but the claimant testified that, although Stas said on his first day back at work that he was happy to have resumed employment, he appeared to be tired during the remainder of the week. On Friday evening, February 8, claimant noticed that her husband appeared very tired, his color was grayish, and he had very little appetite. On Saturday, Stas slept late, had little appetite and rested most of the day. That evening he complained to claimant that his

left arm was bothering him. He asked for some Bromo Seltzer, which claimant prepared for him. Stas got up at 2 a.m. on Sunday, February 10, and told claimant, who also awoke, that he ached all over. When Stas thereafter awoke again, rubbing his left arm, claimant urged him to go to the hospital, but he refused. After getting dressed, he appeared very restless. That afternoon, claimant decided to call Dr. Veratella. She described the symptoms to the doctor, and he told her to bring Stas in on Monday morning. Claimant later found Stas unconscious in bed. He was taken to the hospital, where he was pronounced dead on arrival.

There is no dispute that Stas died from a heart attack on February 10, 1974. The death is compensable under the Act if the decedent's employment was a causative factor, and the employment need not be the sole causative factor or even the principal causative factor. (*Johns-manville Corp. v. Industrial Com.* (1975), 60 Ill.. 2d 221, 226; *Republic Steel Corp. v. Industrial Com.* (1962), 26 Ill. 2d 32, 45.) Additionally, the fact that the decedent's last heart attack did not occur while the employee was actually engaged in the performance of employment duties does not preclude a finding that the employment was a causative factor in the death. (*McLean Trucking Co. v. Industrial Com.* (1978), 72 Ill. 2d 350, 357; *Illinois Valley Irrigation, Inc. v. Industrial Com.* (1977), 66 Ill. 2d 234, 240; *Sohio Pipe Line Co. v. Industrial Com.* (1976), 63 Ill. 2d 147, 152.) Nor does a preexisting heart condition render an award of compensation against the manifest weight of the evidence where the Commission may legitimately have inferred from the the evidence that the employee's occupational activity was a causative factor in the death. *Illinois Valley Irrigation, Inc. v. Industrial Com.* (1977), 66 Ill. 2d 234, 240.

Claimant sought to establish the necessary causation by showing that the February 10, 1974, heart attack was

caused in part by the November 16, 1973, heart attack, and that employment-related activity and stress were a causative factor in the November 16 attack. When employment activities create a higher than normal degree of stress, and that stress contributes to the employee's death, the necessary causation is established. (*County of Cook v. Industrial Com.* (1977), 69 Ill. 2d 10, 19; *Wirth v. Industrial Com.* (1974), 57 Ill. 2d 475, 481.) We do not find the claimant's means of establishing causation impermissible, and the Commission's finding that causation was proved will not be set aside unless contrary to the manifest weight of the evidence (*McLean Trucking Co. v. Industrial Com.* (1978), 72 Ill. 2d 350, 357-58).

Dr. David Fisher, claimant's medical expert, stated that, in his opinion, there was a direct relationship between Stas' death and his November 16, 1973, myocardial infarction. In support of his opinion that the two events were directly related, Dr. Fisher testified that the initial infarction resulted in a scarring of the heart which, particularly during the first year, made the heart more vulnerable to another attack because of its lessened ability to respond with muscular activity.

Respondent did not rebut this testimony at the arbitration hearing, but, on review before the Commission, it offered the opinion of Dr. Gerry Albin Smyth that Stas' death and his myocardial infarction on November 16, 1973, were not causally related. On cross-examination, however, Dr. Smyth admitted that the damage resulting from the initial heart attack lessened Stas' chances of surviving the second one.

Dr. Fisher provided competent testimony from which the Commission could have found that Stas' death from this heart attack was causally related to his November 16 heart attack. Although Dr. Smyth contradicted Dr. Fisher on this point, the resolution of this conflicting medical testimony was a matter for the Commission (*Crow's Hybrid Corn Co. v. Industrial Com.* (1978), 72 Ill. 2d 168,

177), and its finding of a causal relationship between the two heart attacks clearly was not against the manifest weight of the evidence. We need only determine, then, whether the earlier heart attack arose out of and in the course of Stas' employment.

The 46-year-old Stas commenced work for Sears in 1958 or 1959. The evidence reveals that he had a drinking problem for 10 years prior to his entering Lutheran General Hospital and that the problem had intensified during the last 5 years. Claimant testified that, in late September or early October of 1973, Grunde asked her to meet with him to discuss Stas' problems at work. During their meeting, Grunde said he thought Stas was an alcoholic, that he needed help, and that Sears would send him to Lutheran General Hospital for the help they thought he needed. According to claimant, Grunde also stated that if Stas did not get help for his problem, the company would take steps to terminate his employment "by means of a medical termination or otherwise."

Claimant also testified that, during the two months prior to her conversation with Grunde, Stas was tense and nervous about work; that he smoked more, shook, had little appetite, and was impatient with family members. About mid-October, Stas stopped going to work. Then, late in the month, he told claimant, "I think I am going to take what Herb wanted me to do. I am going to go to the Lutheran General."

Upon entering the hospital, Stas underwent tests for three or four days and then was sent to the Alcoholic Rehabilitation Center. He remained there until Friday, November 16, 1973, the day of his heart attack, which, claimant was told, was very severe. On the day preceding the heart attack, the family had met with a therapist at the hospital to discuss Stas' case. A meeting was scheduled between Stas and Grunde for 1 p.m. the next day.

Grunde testified that, a few weeks prior to Stas' hospitalization, he "had some very firm conversations" with

Stas regarding drinking and, about a week before Stas entered the hospital, told him if he did not get help, he would undoubtedly lose his job because of increasing absenteeism and decreasing quality of performance. Following this last conversation, Stas was away from work for about a week, then called one morning and asked Grunde to get him help. Grunde testified that he called a person employed in the Sears Group Insurance Department and, subsequently, received a call from a person at Lutheran General Hospital who told Grunde to have Stas report to the hospital on October 31, 1973. Grunde informed Stas that the arrangements had been made, told him when to report, and offered to take him to the hospital. After Stas had entered the hospital, Grunde talked to Miss Payne at the Rehabilitation Center on two occasions, once for a progress report on Stas, and once to arrange a counseling session.

Virginia Payne, a therapist at Lutheran General's Alcoholic Rehabilitation Center, testified that she concluded after her initial interview with Stas that he was an alcoholic. With Stas' agreement, she assisted in setting up a treatment program which included the involvement of Stas' family and his employer. Sessions were held with Stas' wife and children, but, Ms. Payne stated, just prior to the scheduled session with Grunde, Stas was transferred to the emergency room of the hospital. Payne could not recall whether she had talked to Stas in the 24-hour period prior to the scheduled session with Grunde. In describing a typical reaction to a meeting with the employer, she stated that the patient is typically "pretty frightened," and that "[i]t would be surprising if they [weren't]." During redirect examination, she said that a meeting of the type scheduled for Stas and his employer could be a stressful situation.

Dr. Fisher stated that, in his opinion, Stas' myocardial infarction on November 16, 1973, was related to anticipation of the session scheduled with Grunde at 1 p.m.

According to Dr. Fisher, the stress which Stas underwent caused overactivity of the adrenal gland and a resultant out-pouring of adrenalin which, in turn, prompted a rise in blood pressure and a concomitant increase in the rate of the heart beat. The body's demand for oxygen increased in response to an active heart muscle and, because of a lack of sufficient oxygen, a portion of the heart muscle died and became scarred. Alcoholism, Dr. Fisher continued, causes the heart muscle to become flabby and soft, and more vulnerable to various stimuli. He opined that Stas had arteriosclerosis, with a narrowing of the vessels which impaired their ability to supply blood to the heart.

Respondent called Dr. Nelson J. Bradley, a physician and psychiatrist who was chairman of the Department of Psychiatry at Lutheran General Hospital and medical administrator of the Alcoholic Rehabilitation Center. Dr. Bradley disclosed that, on admission, Stas' electrocardiogram was normal. Presumably because of alcohol, there was evidence of damage to Stas' central nervous system, he suffered from mild hypertension, his coping ability was poor, his defenses were down, and he was unable to deal with demands. Withdrawing Stas from alcoholism involved administering progressively smaller dosages of Valium over a period of several days until November 11, 1973, at which time Valium was discontinued. Stas' heart attack, according to Dr. Bradley, was caused by the "total damage to the body" resulting from the excessive, prolonged use of alcohol. Dr. Bradley stated that "the heart [not the liver] is now the number one worry in the field of alcoholism."

On cross-examination, Dr. Bradley admitted that a person with a history of hypertension is more prone to heart attacks and that the toxic effects of alcohol reduce the heart's ability to withstand external stress. He admitted further that a person in the alcoholic rehabilitation program can experience anxiety, apprehension or tension

prior to the first meeting with the employer, and that a feeling of stress, anxiety or tension can increase adrenalin output.

On review before the Commission, respondent presented the testimony of Mark Goodrich and Dr. Smyth. Goodrich, a training assistant with Grant Hospital's Alcoholism Training Institute, felt that stress and anxiety are present throughout the alcoholic rehabilitation process, but that the presence of the employer, rather than adding to the stress, is a comforting and soothing factor for the alcoholic.

Dr. Smyth testified that alcohol has an adverse effect on the heart, and that it raises both the pulse and blood pressure. In the opinion of Dr. Smyth, there was no relationship between Stas' myocardial infarction on November 16, 1973, and the meeting that was to take place with the employer that day. He stated, however, that stress produces increased adrenalin flow and, on cross-examination, that adrenalin injected into the system constricts the blood vessels, thereby increasing demands on the heart.

′ Exhibits evidenced that, under respondent's medical and employee-benefit plans, alcoholism is looked upon as any other illness. However, respondent's concern with alcoholism, as with other illnesses, is limited to the effect it may have on an employee's attendance and job performance. Stas entered Lutheran General Hospital under an alcoholic-treatment program subscribed to by respondent for its employees. While respondent claims Stas' entrance into the program was voluntary, claimant argues that it was as the result of threats, duress, and coercion by respondent.

For Stas' participation in the rehabilitation program to have been within the course of employment, it must have had a purpose related to his employment, i.e., his participation must have directly or indirectly carried out respondent's purposes or advanced its interests.

We note that respondent established the alcoholic-rehabilitation program for its employees whose job performances became affected by their drinking. It was in the respondent's interest to forestall, minimize or eliminate that effect and to increase employee productivity by making the program available. Respondent's sponsorship is apparent in that the company made all arrangements for an employee's entrance into the program, and included the cost within the package of employee benefits. That the respondent exercised persuasive pressures to gain Stas' participation is evident in the testimony of both claimant and Grunde, for, minimally, Grunde strongly encouraged Stas to enter the program. These factors are sufficient to support a finding that Stas' participation in the program was within the course of his employment with respondent.

Respondent points out that there was no direct evidence that Stas in fact experienced stress over the prospect of meeting with Grunde. Both Ms. Payne, Stas' therapist, and Dr. Fisher expressed independent opinions as to the stress-inducing nature of a first meeting between the employer and the patient-employee. Dr. Bradley, respondent's witness, also admitted to the possibility of anxiety prior to such a meeting. This accompanies evidence that Stas underwent periods of stress prior to the time in question, and was more susceptible to stress than the normal person. A medical witness can testify in terms of probabilities as to the cause of the heart attack; such testimony is not objectionable as being inconclusive or speculative. (*County of Cook v. Industrial Com.* (1977), 69 Ill. 2d 10, 18.) It is within the province of the Commission to decide questions of fact and to draw reasonable inferences from the evidence. *Johnson Outboards v. Industrial Com.* (1979), 77 Ill. 2d 67, 71-72; *Bruno v. Industrial Com.* (1964), 31 Ill. 2d 447, 448-49.

The Commission may well have determined that the rehabilitation program and the stress resulting from the

scheduled session with the employer combined to cause Stas' heart attack. Both factors were connected with his employment and presented risks greater than those to which the general public is exposed. (See *County of Cook v. Industrial Com.* (1977), 69 Ill. 2d 10, 18.) We cannot say that the Commission's decision was contrary to the manifest weight of the evidence.

Accordingly, the judgment of the circuit court of Cook County is reversed and the award of the Commission is reinstated.

*Judgment reversed;*
*award reinstated.*

MR. JUSTICE RYAN, dissenting:

The majority of this court appears to me to have strained in order to reach a desired result. Although the awarding of compensation to a widow for the death of her husband may indeed be laudable, I fear that the placing of responsibility on the employer in this case may discourage the continuance of employer-sponsored rehabilitation programs. It is true that Sears may have derived some indirect benefits from the rehabilitation of its employees. It cannot be denied, however, that the primary beneficiaries of such a program are the alcoholics who have, through its use, been rehabilitated. There are, no doubt, many Sears employees who are leading productive lives today because of this program. I, for one, do not want to discourage employers from instituting or continuing activities which are so benficial to the employees. A death award under the present provisions of the Workmen's Compensation Act is not insubstantial. Such an award could very well convince an employer that it is to its benefit not to attempt to rehabilitate its employees, but to discharge them. For this reason I dissent from the majority holding.